312 A.2d 720.

In re Petitions of Richard R. DeOrsey, Jeffrey E. Ramsey, Raymond L. Baccala, Jr.

DECEMBER 19, 1973.

Present: Roberts, C. J., Paolino, Joslin*, Kelleher and Doris, JJ.

KELLEHER, J. We have consolidated these three petitions which ask that we reverse the refusal of the Board of Bar Examiners to recommend the petitioners' admission as members of the bar of this state. Hereafter, when necessary, we shall refer to the petitioners by their last names.

All three petitioners are graduates of law schools having the accreditation of the American Bar Association. They are in all respects, but one, qualified to practice law in Rhode Island. Their one deficiency is an inability to pass the written portion of the bar examination. DeOrsey and Baccala have taken the examination three times without success. Ramsey had taken the examination twice prior

to filing his petition. He took it once thereafter and all his efforts have proven fruitless.

Examinations for admission to the Rhode Island Bar are held twice a year. The written portion of the examination was and still is a two-day affair. Prior to February, 1972, the written portion of the bar examination consisted of 40 essay type questions. Twenty questions were given on one day with the remaining 20 being given on the following day. Each day was broken into a morning and an afternoon session with ten questions submitted to the candidates at each session. In February, 1972, the examiners began using the Multistate Bar Examination (hereafter called the multistate). The multistate is an objective type of exam developed by the National Conference of Bar Examiners and administered by the Educational Testing Service at Princeton. Its goal is the attainment of a "uniform national standard of proficiency in the five multistate subjects." It tests a candidate's knowledge of law in the areas of contracts, torts, criminal law, real property and evidence. The examination consists of 200 multiple-choice questions. When sorted out, there are 40 questions relating to each of the five subjects covered by the test. The candidate gets one point for each correct answer. A perfect score on each subject is 40. A perfect multistate score is 200. In 1973, some 35 jurisdictions were using the multistate. 42 The Bar Examiner 154 (1973). The multistate is given on one day of the examination, while the second day is devoted to the essay type of examination. The Board of Bar Examiners consists of five members. Each member prepares a portion of the essay type examination.

The examinations under review are those given in February and July, 1972 and February and July, 1973. DeOrsey took the 1972 and the February, 1973 examinations.

Baccala and Ramsey have participated in the last three sessions.

The board has furnished us with copies of the minutes of each of its meetings when the criteria for a pass or a failure for each of the four examinations were established. With these documents in hand and from a study of the exhibits attached to the various petitions, we can chronicle the events which have led to these proceedings.

In February, 1972, 33 applicants took the examination. There were 12 failures. The board's record showed that six candidates were classified as unsuccessful because of their failure to answer properly the questions prepared by three or more of the examiners. The passing grade had been established at 67 per cent. Three other candidates failed because their average score on the essay portions of the examination was below 67 per cent and their multistate score was in the lower 15 percentile of all of those who were administered the multistate nationally. Finally, three others were rejected because, while they might have passed three portions of the essay section of the exam, their multistate scores placed them in the second-seventh percentile range nationally.

When the examiners reviewed the July, 1972 examination, the following criteria were set for pass-fail:

"(1) Fail if failing three examiners, unless scoring in top 50% of Rhode Island group on multistate.

"(2) Fail if failing two examiners and in the bottom 22.4% of Rhode Island group (117 or below) on multistate.

"(3) Fail if having an average of less than 67% in Rhode Island essay results, unless in top 50% of Rhode Island group are multistate."

After the board had graded the examinations submitted by the candidates taking the February, 1973 examination, the board adopted the so-called ten-point system. A candidate who gained five points passed the examination.

The points were earned in the following manner: The essay portion of the examination offered a potential of five points. There were five portions to this phase of the examination. Each portion was prepared and corrected by each one of the examiners respectively. Sixty-seven per cent was the passing grade. If a candidate passed each of the five portions of the essay examination, he had earned the required points.

The Rhode Island median[1] score on the February, 1973 multistate was 121.25 points. The examiners used the figure 120 as the fail line. They then divided this figure by the numeral 5 — the number of subjects covered by the examination. This gave a result of 24. Accordingly, if a candidate scored 25 or more points in one of the subjects included in the examination, he earned one point. A candidate obtaining a score of 25 points or more in all five subjects, earned five points.

Any combination of passing the board's portion of the examination and the subjects in the multistate which added up to five points spelled success for any of the candidates. With this formula as its guide, the board passed 34 of the 54 candidates who took the winter, 1973 examination.

Shortly after this result was announced, attorneys representing James Hall, one of the unsuccessful candidates, wrote a lengthy letter to the chairman of the board in which they pointed out, among other things, that Hall had taken the July, 1972 examination and that if the board had applied the July, 1972 standards to Hall's February, 1973 examination, he would have been eligible for membership in the bar. Hall's score on the multistate was in the top 50 per cent. At this point the board decided to re-

---

[1]The median is a point where there are as many scores above it as there are below it. It is to be distinguished from a mean score where all the scores are added up and the total sum is divided by the number of applicants.

evaluate the examinations of all 20 unsuccessful candidates in the light of the criteria it had followed in the summer of 1972. As a result of its re-evaluation, the board notified us that it would recommend the admittance of seven additional candidates, including Hall. The other six candidates were the fortuitous beneficiaries of the efforts, skill and diligence exhibited by Hall and his counsel.

DeOrsey argues that the examiners, in using their February, 1973 five-point scoring to evaluate the July, 1972 examination, were arbitrary in that they should have also applied the point-scoring system to his February, 1972 examination. If they did, he claims that he would have garnered the magic five points.[2] DeOrsey has misconceived what actually occurred when the examiners reconsidered the February, 1973 results. The examiners did not apply the point system to the July, 1972 result. What they did was to apply the July, 1972 *criterion* of upper 50 per cent to the February, 1973 *results*. In other words, if any of the 20 unsuccessful candidates had a February, 1973 score that ranked in the top 50 per cent of the Rhode Island multistate scores, they would be considered as passing the written examination. This change was motivated by the fact that, after the July, 1972 results were announced, all unsuccessful candidates could and many of them did confer with the examiners to discuss their shortcomings and the scoring procedures. At these conferences the importance of the multistate score was stressed and after consideration of Hall's communication, the examiners believed that, in fairness to all the candidates, they would apply the summer criteria to the winter results.

We take this opportunity to express our support for the

---

[2]In the February, 1972 examination, DeOrsey received a grade of 67 per cent from four of the five examiners. His remaining grade pulled his average below the requisite overall average of 67 per cent. He received a score of 27 points for the multistate torts section.

forthright position taken by the board once they were made aware of the reliance Hall and others had placed on their earlier conversations with the examiners. The examiners, like this court, are not bent on setting a quota as to the number of duly qualified candidates who will be admitted to practice in this state. Nevertheless, we are concerned that the candidates attain the standards that are established by the examiners.

Baccala takes a tack somewhat akin to the contention espoused by DeOrsey. Baccala argues that if the February, 1973 method of scoring the multistate was applied to his July, 1973 multistate, he would have obtained the requisite number of five points. However, the examiners noted an apparent difference in the degree of difficulty of the five tests given in the summer of 1973 when compared to those given the preceding winter. They therefore ruled that a point would be earned only if the candidate scored above the Rhode Island midpoint on *each* of the particular exams given at that time. For ease of understanding, we shall list the subjects, the Rhode Island midpoints, and Baccala's scores in each of these areas on the July, 1973 multistate.

| Subject | Rhode Island Midpoint | Bacalla's Score |
|---|---|---|
| Contracts | 28 points | 27 points |
| Torts | 28 " | 24 " |
| Criminal Law | 26 " | 27 " |
| Property | 20 " | 18 " |
| Evidence | 27 " | 28 " |

A rapid calculation shows that Baccala exceeded the Rhode Island midpoint in two subjects — criminal law and evidence. The scores, when combined with the results of the essay part of the examination, amounted to four points. Baccala stresses that if the winter, 1973 median of 25 points were applied to his summer, 1973 scores, he

would pick up the necessary total points because he would have attained success in the fields of contracts, criminal law and evidence.

In his petition, Ramsey lists several complaints which he describes as being violative of basic fairness and due process. He argues that all 20 unsuccessful candidates should have been admitted once the board started its re-evaluation. He faults the examiners for their delay in establishing the pass or fail mark until all the tests had been graded. He also questions the efficacy of the essay type examination and at the same time criticizes the board's grading its portion of the examination while "comparing the examinee's score" on the multistate. He also alleges that the number assigned to him for the February, 1973 examination, readily identifying him as a prior unsuccessful examinee, robbed him of his anonymity and thereby deprived him of his chance for equal consideration with the other examinees.

When all is said and done, the issue before us is whether we shall overturn the board's actions in refusing to admit the petitioners because its members abused its discretion or its decision was clearly wrong. *In re Capace*, 110 R. I. 254, 291 A.2d 632 (1972). The board of bar examiners is appointed pursuant to Rule 36 of this court. Its members are selected by the court from the ranks of those in the legal profession who enjoy a high standing in this jurisdiction. In the method of examining and grading applicants seeking admission to our bar, the members of the board are vested with a wide range of discretion. We will not embark on an investigation to ascertain the integrity of the examination results in the absence of clear unequivocal allegations of probative facts that would establish fraud, imposition, discrimination or manifest unfairness on the part of the examiners.

Today is the age of consumerism and apparently that

trend has permeated the ranks of those who seek our license. All issues raised by petitioners are novel to this court. However, the principles which we have just enunciated are in accord with the rule prevailing in other jurisdictions. *Application of Heaney,* 106 Ariz. 391, 476 P.2d 846 (1970); *Staley* v. *State Bar,* 17 Cal.2d 119, 109 P.2d 667 (1941); *In re Monaghan,* 126 Vt. 193, 225 A.2d 387 (1967); see also Annot. *Court Review of Bar Examiners' Decision on Applicant's Examination,* 39 A.L.R.3d 719 (1971).

Within the year the Supreme Court has again recognized the substantial and constitutionally permissible interest which a state has in determining whether an applicant possesses the character and general fitness required of an attorney and counselor at law. *In re Griffiths,* 413 U. S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). This court, and it alone, has the power to license attorneys and admit them to the practice of law. *Rhode Island Bar Ass'n* v. *Automobile Service Ass'n,* 55 R. I. 122, 179 A. 139 (1935). The Board of Bar Examiners acts as an arm of this court. Its recommendations will not be overturned unless we are convinced that they are not well-founded.

As noted earlier, DeOrsey is mistaken as to what actually occurred when the board agreed to employ the summer of '72 criteria to the winter of '73 results. Unfortunately, neither he nor the other petitioners qualified under either scoring method. Baccala's disappointment with scoring so close to success is entirely understandable. The examiners' motivations for re-evaluating the examinations of the 20 unsuccessful candidates, as well as their modification of awarding points for achievement in the summer of 1973 multistate, are based on reason and in no way smack of arbitrariness.

We see no merit in Ramsey's complaints. His charge that his loss of anonymity prejudiced him leaves us at a

loss as to what it means. The fact that the pass-fail line is not established until all the examinations are graded and analyzed works to the advantage rather than the disadvantage of the candidates. What the examiners do is to scale the marks — a system which we are sure was employed at the law schools attended by petitioners. It would be strange if the examiners set the passing standard before the test was given and then found the results were somewhat less than what they expected.

In summary, then, we see nothing in what has been presented to us which would cause us to conclude that petitioners' difficulties are due to any devious, capricious or unfair conduct by the examiners.

The petitioners have asked that we exercise our plenary power and admit them to practice. They point to the fact that they have received their law degrees from accredited and approved institutions. They stress their tremendous expenditures of time and effort, as well as the many sacrifices that they have made in arriving at the courtroom or law office's threshold. They are prepared to present, and in some instances have presented us with affidavits of attorneys which attest to their legal ability. We are well aware of the frustrations, despair and even difficult financial circumstances experienced by petitioners. We must temper our compassion with the realization that the practice of the law is steeped in the public interest. *Rhode Island Bar Ass'n* v. *Automobile Service Ass'n, supra.* Our license is a representation to the public that the possessor thereof is apparently qualified to represent it in any one of a myriad of situations that hold a potential for future litigation. At this moment in time we are not prepared to hand over our responsibility in this area to a law school faculty whose marking proclivities may manifest itself in a number of ways, be it by a desire to promote social

justice or by an effort to maintain one's reputation as a tough marker.

Adoption of the alternatives[3] described above would abolish any semblance of objective criteria and would replace them with a shifting standard which would lead to an ad hoc system of admissions. The petitioners' suggestions, if adopted, would becloud any assurance by us that the particular individual has the requisite qualifications to advise and represent clients in legal matters. *Application of Peterson*, 459 P.2d 703 (Alas. 1969).

It is our belief that when one fails to pass an appropriate and properly administered bar examination, a reasonable inference to be drawn therefrom is that he has demonstrated a lack of proficiency that warrants a denial of a license to practice law. We therefore hold that the petitioners have not as yet demonstrated the necessary qualifications for admission to practice law in this state.[4]

In each cause, the petition is denied and dismissed.

---

[3]In April, 1973, we denied DeOrsey's petition for a "provisional license." In his petition DeOrsey described the financial problems he has encountered because of his inability to practice. *In re DeOrsey*, 111 R. I. 925, 303 A.2d 372 (1973). Ramsey has suggested that repeaters should be allowed to accumulate points. Points earned on prior examinations would be added to the points earned on a current examination. We reject such a suggestion because it would not insure the requisite proficiency which the ultimate consumer, the client, has a right to expect. For an enlightening and persuasive view as to the positive purposes served by the continued maintenance of the bar examinations, see Griswold, *In Praise of Bar Examinations*, 42 The Bar Examiner 136 (1973).

[4]Our Rule 33 limits the number of times a candidate can take the bar examination to three unless he obtains leave of this court. The petitioners may request this court for permission to take the February, 1974 examination. if they so desire.

*Raymond J. Daniels,* for Richard R. DeOrsey; *Alton Wiley, Richard I. Abrams, Walter R. Stone,* for Jeffrey E. Ramsey; *Leonard A. Kiernan, Jr.,* for Raymond L. Baccala, Jr., for petitioners.

*Edwin H. Hastings,* Chairman, State of Rhode Island Board of Bar Examiners, for respondent.

---

*Mr Justice Joslin did not participate in the consideration of the De-Orsey petition. He did, however, participate in the consideration of the Ramsey and Baccala petitions.