Thomas C. HARPER and Gary Williams et al., Petitioners,

v.

DISTRICT OF COLUMBIA COMMITTEE ON ADMISSIONS et al., Respondents.

Nos. 8102, 8433.

District of Columbia Court of Appeals.

Argued Dec. 21, 1976.

Decided June 2, 1977.

Dorsey E. Lane, Washington, D. C., for petitioners Gary Williams et al.

Douglas J. Pride, Youngstown, Ohio, entered an appearance as petitioner pro se.

Thomas C. Harper, petitioner, pro se.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the pleadings for respondents.

Before KERN and YEAGLEY, Associate Judges, and PAIR, Associate Judge, Retired.

KERN, Associate Judge:

We are confronted with two petitions[1] challenging the procedures for admission to the Bar of the District of Columbia Court of Appeals. All petitioners are black graduates of accredited law schools who have failed the District of Columbia Bar examination and hence have been denied membership in the Bar.

Petitioner Williams and the others named in his petition now challenge the examination on the grounds that (1) "[n]o right of review of examination papers is accorded 'unsuccessful' applicants for admission to the bar in this jurisdiction . . . [and this failure] deprives them of liberty and property without due process of law"; (2) there is no "valid relationship between it [the examination] and the practice of law"; and (3) the examination "as constructed, administered and graded is so highly biased on a cultural basis against Blacks as a group . . . that it is racially discriminatory . . . and . . . unlawfully excludes them from the practice of law."

Petitioner Harper requests in his petition that he be permitted to invoke the Post Examination Review Procedure established by this court's Committee on Admissions, effective May 1975, to the examination paper he submitted in February 1974, upon which he received a grade of 69.2 thereby failing to achieve the passing score of 70 by eight-tenths of one point.

By way of background we point out that Congress has vested in this court authority and responsibility for determining the method of admitting attorneys to the practice of law in the District of Columbia. D.C.Code 1973, § 11–2501. This court in turn has established (1) a six-member Committee on Admissions composed of attorneys currently practicing law here to examine applicants for admission, and (2) a staff to assist the Committee, full time, in its work. D.C.App.R. 46. The court has pre-

scribed by rule the areas of law[2] on which applicants are to be examined by the Committee in the form of questions calling for essay-type answers and the passing score to be achieved by the applicants in this portion of the examination, viz., 70. The rule further provides for the applicants also to undertake the Multi-state Bar Examination (MBE) developed by the National Conference of Bar Examiners and the Educational Testing Service (ETS) in the areas of Criminal Law, Contracts, Evidence, Real Property and Torts. ETS scores by machine the applicants' answers to the MBE, a multiple choice-type examination. In 1976, Constitutional Law was added to the MBE.

■ We turn first to Petitioner Harper's claim. His argument is essentially one of equity: had the Committee's Post Examination Review Procedure been in effect in February 1974 when he submitted his paper, then he would have had the opportunity to request regrading by the Committee and his grade, 69.2, was close enough to 70 so that any review at that particular time might have made a crucial difference. In essence, the Committee's review procedure is as follows. Each unsuccessful applicant is notified of his score on each essay question, his "raw score" for each section of the MBE, and his combined score. Upon request, the applicant may meet with the Secretary to the Committee for a review of his essay paper and the questions as framed by the examiners and the examiners' comments with respect to each question. An unsuccessful applicant may submit within a fixed time, without identifying himself, a petition for regrading to each examiner he wishes with supporting reasons. The Secretary must submit to each examiner so petitioned, the petition, the petitioner's examination book and the examiner's questions and comments with respect to such questions. The unsuccessful applicant is noti-

---

1. Petitions filed by Douglas J. Pride in essence raise the same contentions as the other petitioners.

2. These areas are Agency, Negotiable Instruments, Constitutional Law, Domestic Relations,

Legal Ethics, Equity, Business Associations, Pleadings and Practice (Civil and Criminal), Personal Property, Conflict of Laws, Wills and Administration of Estates, Administrative Law, and Tax Law.

fied by the Secretary of the examiner's ultimate disposition of his petition for re-grading and the applicant may obtain, upon request, finally a review of the regrading petition and the examiner's disposition thereof by *two other members* of the Committee.

The Corporation Counsel, appearing on behalf of respondents, argues that if petitioner Harper is accorded a review of his paper, *nunc pro tunc,* then this court has no basis to deny other unsuccessful applicants in the 1974 and February 1975 examinations[3] an opportunity to invoke the Committee's current review rule. In sum, respondents question how a line may be drawn.

We are of opinion that no line should be drawn. All unsuccessful applicants who sat for the examinations given in July 1973 and in February and July 1974 are entitled in our view to the Committee's Post Examination Review Procedure, provided they apply to the Committee in writing within 60 days from the issuance of this opinion. We rest this determination upon our statutory authority over the admission of attorneys to practice law in the District of Columbia and our supervisory authority over the Committee.

We turn now to the contentions of Petitioner Williams and the others who have joined with him in his petition. Their complaint alleging that absence of a post-examination review of the essay-type answers submitted by unsuccessful applicants violates Due Process is answered by the Committee's adoption, as we have noted, of a comprehensive and detailed "Post Examination Review Procedure." We deem this procedure adequate to meet all of their Due Process demands.

■ Next, we consider the contention that there is no valid relationship between the examination and the practice of law within the District of Columbia. Such a challenge has been raised in various states and uniformly rejected by the reviewing courts. *Richardson v. McFadden,* 540 F.2d 744 (4th Cir. 1976) (South Carolina); *Feldman v. State Board of Law Examiners,* 438 F.2d 699 (8th Cir. 1971) (Arkansas); *Chaney v. State Bar of California,* 386 F.2d 962 (9th Cir. 1967), *cert. denied,* 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968); *Application of Peterson,* 459 P.2d 703 (Alaska 1969); *Petition of Pacheco,* 85 N.M. 600, 514 P.2d 1297 (1973); *Petition of DeOrsey,* 112 R.I. 536, 312 A.2d 720 (1973).

■ The Fifth Circuit in *Tyler v. Vickery,* 517 F.2d 1089, 1102 (1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976), quoted *Banks v. Miller,* Civil No. 15876 (N.D.Ga. Aug. 11, 1972) as follows:

> The relevant question must then be whether the passing of an examination made up of subjective essay-type questions has a rational connection with the applicant's ability to practice law in the State of Georgia. It is beyond question that it does. While plaintiff would apparently favor a more objective type of examination, much of an attorney's actual work once admitted into practice involves the analysis of complicated fact situations and the application thereto of abstract legal principles. Both in legal practice and with these essay-type questions, recognition of the legal problem presented and well-reasoned explication of the relevant considerations is of utmost importance.

We have no hesitation in concluding that the Committee's essay examination has a rational relationship to the practice of law in the District of Columbia and hence is a valid prerequisite to admission to the Bar. *See Schware v. Board of Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Whitfield v. Illinois Board of Law Examiners,* 504 F.2d 474 (7th Cir. 1974); *Pettit v. Gingerich,* 427 F.Supp. 282 (D.Md.1977); *Lewis v. Hartsock,* No. 73–16 (S.D.Ohio Mar. 9, 1977) (unpublished); *cf. Washington*

---

3. All the examination papers prior to July 1973 have been destroyed pursuant to the Committee's rules.

v. *Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[4]

We deal finally with petitioner's contention that the examination "as constructed, administered and graded" is "racially discriminatory" and therefore violative of the Constitution. The Supreme Court recently upheld against constitutional attack a test administered to "prospective government employees . . . to ascertain whether those who take it have acquired a particular level of verbal skill." *Washington v. Davis, supra* at 245, 96 S.Ct. at 2050. The Court pointed out "[t]he central purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race," *id.* at 239, 96 S.Ct. at 2047 and concluded that a "discriminatory purpose" must be demonstrated "upon the totality of the relevant facts." *Id.* at 242, 96 S.Ct. at 2049.

In the instant case, the Committee Chairman described by affidavit the practice employed in constructing the questions and grading the answers:

A. Areas of law are divided among the Committee members.

B. Each Committee member frames questions on the areas assigned. The questions are then submitted to the full Committee.

C. The full Committee reviews, comments on, and approve[s] the questions.

D. Each question, as approved, is accompanied by a commentary setting forth the applicable principles raised by the questions.

E. Questions are framed with the idea of offering the applicant the opportunity to comment on the pertinent legal principles. Questions generally are not framed with the idea of there being one right answer. The papers are graded in accordance with the applicant's knowledge of the applicable legal principles and with the recognition of the issues raised by the question.

4. We also reject petitioner's complaint that the passing score of 70 percent is arbitrary and therefore not "predictive" of an applicant's ability to practice law so as to violate the

4. The Committee does not predetermine what percentage will be given a passing score.

The Committee's Secretary set forth in affidavit form the mechanics of the administration and grading of the essay examination:

Since its inception, the Committee has prepared and graded bar examinations without knowledge of the name, race, sex, or other identifying factor of any applicant. Each accepted applicant for the bar examination is assigned an "examination identification number" known only to the Secretary, his staff (two assistant secretaries) and the applicant. Disclosure of the number is prohibited under Rule 46I(b)(6) of the Rules of the District of Columbia Court of Appeals.

\* \* \* \* \* \*

As I receive the grading sheet and answer booklet from a Committee member I insure that the grade appearing on the grading sheet is the grade appearing on the cover of applicant's answer booklet. Discrepancies are immediately reported to the Examiner concerned for correction. The applicant's answer booklet is then placed in the envelope in which he initially placed his examination identification number when he received his questions at the examination site, and his score for the booklet is placed on the envelope. Additionally, a Master Grading Sheet is maintained reflecting only the applicant's examination number, columns for each essay group, total essay score, converted essay score; each MBE group, MBE raw score, MBE converted score and the combined score. . . . The MBE subject scores and the total MBE raw score are entered on the Master Grading Sheet upon their receipt from the Educational Testing Service. Upon receipt of the essay grades from the Examiners, these are also entered on the Master Grading Sheet. After all essay grades are re-

dictates of the Equal Protection Clause. We find it to be a reasonable requirement. *See Richardson v. McFadden, supra* at 749–50.

ceived they are totaled and divided by 1.8. Both the essay raw and converted scores . . . are entered in the appropriate columns on the Master Grading Sheet. Additionally, the grades on each applicant's envelope are totaled and converted. The scores on the Master Grading Sheet are then checked against the scores appearing on the face of the envelope and MBE scores appearing in the report of the Educational Testing Service. This procedure is repeated twice to insure accuracy of the applicant's grades.

Petitioners have not sought to contravene these affidavits as they describe how the Committee administers and grades the examination. We are satisfied that the Committee has not engaged in any purposeful discrimination in the administration and grading of the examination. In this connection we note that the Director of Testing of the National Conference of Bar Examiners has opined that the correlation between the applicant's grade on the MBE and on the local essay examination "is very good" and "one of the highest we have ever recorded." Since the MBE is a multiple choice examination administered in almost every other jurisdiction and is not alleged by petitioners to be racially discriminatory, we think the correlation noted is persuasive in demonstrating that the Committee's essay-type questions are not constructed, administered or graded in a discriminatory manner. *See Washington v. Davis, supra* 426 U.S. at 256, 96 S.Ct. 2040 (Stephens, J., concurring); *Richardson v. McFadden, supra* at 748–50.

Petitioners vigorously assert, however, that they have raised a colorable constitutional claim entitling them, at least, to a hearing by their allegation that the examination, *as constructed,* contains a "cultural bias against Blacks as a group" by its questions dealing with matters that "persons of the white middle class have become familiar with because of family background, non-underprivileged private and public schools and colleges . . . with curricular and other educational modalities steeped in sophistical language pattern similar to those used by the . . . Bar Examiners, all of whom are either white or non-underprivileged." The Committee in this case has submitted questions it has employed in several previous examinations. (See Appendix.) It appears to us that these questions are "neutral" on their face, *Washington v. Davis, supra,* 426 U.S. at 246, 96 S.Ct. 2040, and do not evidence cultural bias or deal with matters that would be so familiar with any particular group of applicants as to give that group an unfair advantage in answering the examination over the remaining applicants. We are persuaded that the Williams' petition is without merit.

Accordingly, we direct the Committee to grant review in accordance with its Post Examination Review Rule to petitioners Harper and Williams and any other person not a member of the District of Columbia Bar who was an unsuccessful applicant on the July 1973 and February and July 1974 examinations, provided they file applications with the Committee within 60 days from the date of issuance of this opinion. Respondent's motion to dismiss the petition by Williams, *et al.,* is granted for the reason they have failed to demonstrate purposeful discrimination by the Committee in its examination.

*So ordered.*

## APPENDIX

The following questions, among others, were presented to applicants on the examination in July 1973 and February, 1974:

Smith, a collector of antique nautical items, visited the Washington Antique Show. He purchased a brass telescope from Jones which had a price tag of $100.00 on it. Jones told Smith the telescope was made in England about 1890 and Smith believed him. Smith put a cash deposit of $25.00 on the telescope and took a receipt with the agreement that the next day he would return with the balance due and pick up the telescope. When Smith returned the next day and offered the balance due, Jones refused to deliver the telescope and offered to return the deposit. Jones said that he had

discovered that the telescope was actually made in 1800 and is worth $500.00. Thereafter Smith brought suit.

1) What would be the nature of Smith's cause of action and why?

2) What defense does Jones have to the complaint?

3) What will be the final result of the litigation if:

a) The Court is convinced the telescope was made about 1890 and worth $100.00.

b) The Court is convinced the telescope was made about 1800 and worth $500.00.

[D.C. Bar Examination, July, 1973.]

You represent Frick, who suspects he is being cheated by his business partner, Drew. You visit Drew, who, knowing you are Frick's attorney, gives you a detailed written statement concerning the transactions in question. Subsequently, you file suit for Frick against Drew in the Superior Court of the District of Columbia. Your suit is based on fraud.

a) As part of his pre-trial discovery Drew's lawyer demands a copy of the written statement Drew gave you. You refuse on the ground that the statement constitutes part of your attorney's work product and is privileged. *How should the Court rule and why?*

b) *What special rule must you follow in your complaint in pleading fraud?*

[D.C. Bar Examination, July 1973; emphasis in original.]

Allen, a registered representative in the offices of Baker, a stockbroker, received a telephone call from a friend asking him to sell certain shares of stock on behalf of their owner, Conn. Later, a messenger delivered the certificates of stock to Baker's office and Baker, in due course, sold them and drew a check on his bank to the order of Conn, representing the net proceeds of the sale. This check was turned over to Allen's friend who forged Conn's endorsement on the check and received payment thereon from the drawee bank. Shortly thereafter, Baker discovered not only this forgery but also that the stock certificates had been stolen from Conn and that his purported signature on the certificates, required to effect their transfer, was also a forgery. Upon discovering this, Baker purchased a like number of shares and delivered them to Conn and then demanded that the bank restore to his account the money it had paid on the checks. When the bank refused, Baker sued it. *Should he recover?*

[D.C. Bar Examination, February 1974; emphasis in original.]

In an adversary proceeding before an Administrative Law Judge of the Federal Trade Commission in which the Commission brought an action against ABC seeking to block the merger of ABC and XYZ Drug Companies, ABC requested the Administrative Law Judge to disclose certain confidential financial records and trade secrets in the possession of the Commission pertaining to a prior corporate acquisition case on which the Commission had ruled favorably. The Administrative Law Judge denied the request.

Believing that the documents were essential to its case before the Commission, ABC filed in the United States District Court for the District of Columbia seeking to compel their disclosure on the ground that failure to do so would deny it a fair hearing. *How would you rule?*

[D.C. Bar Examination, February 1974; emphasis in original.]