SUPERIOR BEVERAGES,
INC., Petitioner,

v.

DISTRICT OF COLUMBIA ALCOHOL-
IC BEVERAGE CONTROL
BOARD, Respondent.

No. 88–658.

District of Columbia Court of Appeals.

Argued Sept. 21, 1989.
Decided Dec. 28, 1989.

Inez Smith Reid, Washington, D.C., for petitioner.

Martin B. White, Corp. Counsel, Chevy Chase, Md., with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

John R. Risher, Jr., Washington, D.C., filed à brief for amicus curiae, Chevy Chase Wine and Liquors, et al.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

This is a case in which an administrative agency has treated regulations promulgated by the Council of the District of Columbia to address one problem as if they had also been intended to deal with an entirely different one. Specifically, the District of Columbia Alcoholic Beverage Control Board (the Board) has construed regulations which severely restrict the terms of credit which wholesalers of alcoholic beverages may extend to retailers as also proscribing sales at favorable prices to those retailers who pay entirely in cash. Concluding that the Board's construction is difficult to reconcile with the language of the regulations and was not contemplated by those who drafted them, we reverse the Board's decision and remand for further proceedings.

I

The basic facts are not in dispute. Petitioner Superior Beverages, Inc. (Superior) is the sole wholesale distributor in the District of Columbia of alcoholic beverages manufactured by the Anheuser Busch Company. From October 1986 to early 1987, Superior allowed its retailers to establish prepaid accounts or escrow funds, which would be held by Superior. Each of Superior's retailers could open an account by making a one-time deposit in an amount determined by its average annual purchases from Superior and the number of its prior delinquent payments. Until Superior terminated the program in early 1988, the accounts contained amounts ranging from $87 to $7100.

From 1986 to February 15, 1988, Superior gave discounts of thirty cents per case to retailers who tendered cash on delivery or who had established prepaid accounts. If a retailer purchasing with cash on delivery was delinquent by more than four to six weeks on a prior purchase, Superior applied the discount to the delinquent amount rather than to the current sale.

On May 11, 1988, the Board, after conducting proceedings initiated by inquiries from Superior, determined that the above-described practices violated District of Columbia Municipal Regulations governing terms of credit. The Board cautioned Superior with respect to these purported violations and ordered Superior's license suspended for one hour.

At the time of the Board's ruling, the regulations in question read as follows:

500.1 No alcoholic beverage shall be sold by any manufacturer or wholesaler to any retailer, nor shall any retailer purchase any alcoholic beverage, except on terms requiring payment in full in cash on delivery or on terms requiring payment in full on or before the fifteenth (15th) day of the month following delivery.

500.2 Any retailer who fails to make payment in full in accordance with the terms of purchase shall not, during the period of the delinquency, make any further purchases except for cash on deliv-

ery, nor, during the period of such delinquency, shall any manufacturer or wholesaler who has knowledge of such delinquency sell any alcoholic beverages to that retailer except for cash on delivery.

500.3 The provisions of §§ 500.1 and 500.2 are hereby determined to constitute a reasonable extension of credit and no enlargement or extension of such terms, whether cash or credit, shall be granted by the wholesaler or accepted by the retailer.

23 DCMR §§ 500.1–500.3 (1986) (recodified and amended 1988).[1] The Board determined that the above regulations "are designed to standardize pricing practices of wholesalers, irrespective of a retailer's method of payment," and that they "contemplate that all retailers will pay the same price for alcoholic beverages regardless of whether payment is made in cash or on credit."[2] *Superior Beverages, Inc.* at 3, No. 687–877C (D.C. Alcoholic Beverage Control Bd. May 11, 1988).

Pursuant to D.C.Code § 1–1510 (1987), Superior petitioned this court to review the Board's decision.[3] As revealed in the briefs and during argument, both parties agree that the regulations quoted above preclude a wholesaler of alcoholic beverages from extending credit to its retailers in a manner that would permit payment after the fifteenth of the calendar month following the month of delivery. The parties further agree that wholesalers may not extend credit to retailers who are delinquent in making payments on earlier purchases.

Many years after the promulgation of these regulations, however, the Board has discerned an additional purpose which it says they were designed to accomplish. It asserts that the regulations also require wholesalers to charge the same price to all of their purchasing retailers, whether the terms of sale call for payment in full on delivery, or permit the retailer to tender some or all of its payment no later than the fifteenth of the following calendar month. The Board relies on the language of section 500.3, which provides that "no *enlargement* of any such terms," i.e., the terms in section 500.1 and 500.2, "whether *cash or credit*," shall be granted or accepted. 23 DCMR § 500.1 (1986) (emphasis added) (recodified 1988). According to the Board, requiring credit purchasers to pay more than purchasers who pay cash in full on delivery is an unlawful "enlargement" of the "cash" terms set forth in the regulations. In addition, according to the Board, permitting cash-on-delivery purchasers to pay less than the amount charged to credit purchasers violates § 500.1's requirement of payment "in full" either on delivery or prior to the fifteenth of the following calendar month.

Superior argues, among other things, that the language "payment in full" refers to the terms of the parties' purchase agreement. It contends that as long as the retailer must pay the wholesaler in accordance with the agreed-upon price prior to the fifteenth of the calendar month following delivery, there is no violation of the regulations. Superior asserts that the regulations do not apply to the actual amount the wholesaler charges or the retailer agrees to pay. We agree with Superior's interpretation.

---

1. While this appeal was pending the District of Columbia Department of Consumer and Regulatory Affairs announced a final rule that will recodify these regulations with only minor editorial changes to the text of § 500.3. *See* Notice of Final Rulemaking, 35 D.C.Reg. 4947, 5014 (1988) (to be codified at 23 DCMR §§ 900.1–900.3). In this opinion, in order to avoid confusion, we use the earlier citation. Our ruling is, of course, equally applicable to the regulations in their revised form.

2. The Board asserted in a communication to Superior which preceded the institution of this proceeding, not only that the regulations impose such a requirement, but also that they "are unambiguous [in this regard], and, in [the Board's] opinion, leave no room for interpretation." Letter from Marlene L. Johnson, Chairperson, Alcoholic Beverage Control Board, to Inez S. Reid, Esq. (counsel for Superior) at 1 (Aug. 6, 1987). We are frankly at a loss to understand the basis for this conclusion.

3. This court has jurisdiction pursuant to D.C. Code § 1–1510 (1987) and § 11–722 (1989).

## II

█ The words of a regulation should be " 'construed according to their ordinary sense and with the meaning commonly attributed to them.' " *LCP, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 499 A.2d 897, 903 (D.C.1985) (quoting *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979)). As we recently noted in *Pareco v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989), "in interpreting a statute we are mindful of the maxim that we must first look to its language and, if it is clear and unambiguous, give effect to its plain meaning." The same applies to interpretations of a regulation.

The language of the regulations at issue here contains no readily apparent reference either to wholesale pricing practices generally or to any notion that cash and credit customers must pay the same price. They are, however, replete with allusions to the *time* at which purchasing retailers must complete their purchases. The heading of the subchapter containing the regulations, which reads: "CREDIT AND DELINQUENCY," 23 DCMR subch. 500 (1986) (recodified 1988), likewise alludes to time of payment, and has nothing to do with price discrimination.

The Board argues that the interpretation offered by Superior renders the language of section 500.3 redundant. It asserts that since section 500.1 declares that "[n]o alcoholic beverage shall be sold, nor shall any retailer purchase any alcoholic beverages, except . . . ," and since section 500.2 specifies that delinquent purchasers "shall not" make further purchases except for cash on delivery, the purpose of limiting the credit period is adequately served by those two sections. According to the Board, the language of section 500.3 is unnecessary to limit the wholesale credit period. Therefore, according to the Board, section 500.3 must serve a different purpose, namely to impose a uniform pricing requirement.

**4.** The provisions of the Act also apply to the relationships between manufacturers and their

Section 500.3, however, represents an attempt to bring the credit regulations within the confines of the Alcoholic Beverage Control Act, D.C.Code § 25–101 *et seq.* (1981 & Supp.1989). Contained in this Act are sections 25–119 and 25–120, which govern the relationships between wholesalers and customers who purchase for resale.[4] These sections contain provisos to the effect that nothing in them shall prevent a manufacturer or wholesaler from extending credit to such a customer in order to permit a purchase to take place. D.C.Code §§ 25–119, –120 (Supp.1989), quoted *infra* at p. 10. As reflected in the discussion at pp. 10–13, *infra,* these provisions were on the books when the current regulations were enacted in 1964. The first clause of section 500.3 is thus a declaration that in the drafters' view the regulations, like the statute, permit a reasonable extension of credit. The section's second clause is a further declaration that the regulations constitute the *only* permissible method of reasonably extending credit.

The Board also argues that if Superior's interpretation is accepted, section 500.3 itself contains redundancies. According to the Board, only "enlargement" or "extension," and only "cash" or "credit" are necessary to achieve the purpose of limiting the credit period; there is no need for the regulations to refer to "enlargement or extension" and "cash or credit" to achieve this purpose. The Board then suggests that the excess language can only mean a new purpose—specifically, a uniform pricing requirement.

We disagree with this contention. Regulations and statutes are not always models of brevity and clarity. We think that any excess language in section 500.3 is probably nothing more than a legislative (or regulatory) attempt to touch all the bases and to dot every "i," in order to close any loophole in the regulation and to forestall legal challenges. That, at least, seems to us the most plausible interpretation that accounts for any redundant language in the three regulations.

customers:

To be sure, the words used by the drafters do not absolutely foreclose the construction which the Board has given them. Section 500.1 prohibits any sale to a retailer "except on terms requiring payment in full in cash on delivery or on terms requiring payment in full on or before the fifteenth (15th) day of the month following delivery"; section 500.3 states that "no enlargement or extension of such terms, whether cash or credit, shall be granted by the wholesalers or accepted by the retailer." If a wholesaler offers a retailer the option of paying cash on delivery at thirty cents per case off the price he would pay if he waited until the 15th of the next month, one might plausibly argue, without doing violence to the words themselves, that the wholesaler is "enlarging" the cash or credit terms beyond the simple choice of "payment in full in cash on delivery" or "payment in full" on the 15th of the next month. Under this theory, the retailer is receiving a discount for immediate payment not available if he pays later (unless he has escrowed a sum of money with the wholesaler). Since enlargements and extensions are proscribed, it is not incompatible with the regulatory language to read sections 500.1 and 500.3 as prohibiting such discounts by requiring strict identity of treatment between those paying cash and those paying on the limited credit terms permitted by the regulation.

█ But even assuming that the words of the regulations could be read in this way without doing violence to the dictionary, we can find nothing in the history of this regulatory scheme to indicate that a prohibition on discounts for cash was what the regulators had in mind. Any prohibition of price discrimination between customers who make full payment with cash on delivery and those who buy on credit would surely constitute an important regulatory policy, even where, as here, only limited credit is allowed. Such a policy would not be difficult to articulate forthrightly, clearly, and directly; if the drafters were attempting to prescribe uniformity between all customers, one would reasonably expect them to say so, "loudly and clearly," or at least a good deal more forcefully than here. Absent plainer language, we are unable to glean a no-discrimination rule from regulations which, on their face, appear to be concerned with the time by which retailers must pay for their wares. Moreover, a consideration of the context in which these regulations came to be adopted provides compelling support for what we deem to be the most natural import of their words.

## III

As the Board candidly concedes, there is no evidence of any affirmative regulatory intent to impose a uniform pricing requirement.[5] A review of the regulatory history readily reveals why the Board has made its concession.

The current credit regulations had their genesis in the original District of Columbia Alcoholic Beverage Control Act, ch. 4, 48 Stat. 319 (1934) (now codified in D.C.Code Ann. §§ 25–101 *et seq.* (1989)). The Act authorized the District of Columbia Commissioners to create an Alcoholic Beverage Control Board, which would have the power to issue, transfer, and revoke alcoholic beverage licenses, along with other duties as prescribed by the Commissioners. *Id.* §§ 4, 6, 48 Stat. at 321–22 (now at D.C. Code §§ 25–104 to –106). The Act also gave the Commissioners authority to prescribe rules and regulations to enforce its provisions. *Id.* § 7, 48 Stat. at 322–23 (now at D.C.Code § 25–107).

Sections 18 and 19 of the Act were designed to prevent the "tied house," an arrangement which exists when a manufac-

---

5. The Board apparently contends that there is nothing in the regulatory history which suggests that the drafters were against uniform pricing, and that the Board is therefore free to read a uniform pricing requirement into the regulations. Silence is, however, of questionable relevance, especially where, as here, there is little if anything in the language and structure of the regulations to support the Board's conclusion. The absence of any disavowal in the history of the regulations of an intent to accomplish some purpose other than the stated one is surely no evidence that the unstated purpose was intended. Drafters focus on what they *do* intend, not on what they don't.

turer of alocoholic beverages has a substantial interest, either overt or covert, in the business of a wholesaler or retailer of such beverages, or when a wholesaler has such an interest in the business of a retailer. *See id.* §§ 18, 19, 48 Stat. at 330–31 (now at D.C.Code §§ 25–119, –120). These sections contained the following provisos: "[n]othing herein contained ... shall prohibit the reasonable extension of credit by a manufacturer for beverages sold to a wholesale or retail licensee," *id.* § 18, 48 Stat. at 331 (codified as amended at D.C. Code § 25–119); and "[n]othing herein contained ... shall prohibit the reasonable extension of credit by a wholesaler for beverages sold to a retail licensee," *id.* § 19, 48 Stat. at 331 (codified as amended at D.C. Code § 25–120).

More than half a century ago, the Board, realizing that a broad interpretation of the above provisos could swallow up the sections' main provisions, began regulating the credit periods in purchase agreements between manufacturers or wholesalers and retailers. Using language designed to come within the constraints of the provisos, the Board declared on October 6, 1936 that "a reasonable extension of credit would be fifteen days with no extension beyond thirty days from the date of any invoice or delivery of beverages." Memorandum from Elwood H. Seal, District of Columbia Corporation Counsel, to the Commissioners at 1 (Mar. 3, 1938). In 1938, pursuant to a recommendation from the Board, the Commissioners approved a more comprehensive regulation governing resellers' purchases of alcoholic beverages on credit. Known as Regulation No. 28, this measure, which is set forth in the margin,[6] also contained language designed to comply with the provisos, and is similar to the regulations which exist today. *See id.* at 3. In a memorandum dated July 14, 1939, the Board stated that the "principal purpose" of Regulation No. 28 was identical to the purpose of sections 18 and 19 of the original Alcoholic Beverage Control Act: they "prevent the so-called 'tied house,'" which can result when "wholesalers ... extend[ ] credit to retail establishments in such amounts and over such a period that the retailers involved [become for] all intents and purposes, actually owned by the wholesalers." Memorandum from Thomas E. Lodge, Chairman, Alcoholic Beverage Control Board, to the Board of Commissioners at 2 (July 14, 1939).[7]

The next significant amendments, promulgated in 1957, altered the regulations to provide that no manufacturer or wholesaler was permitted to sell alcoholic beverages *at all* to retailers who were more than thirty days behind in their payment obligations to any manufacturer or wholesaler. 4 D.C. Reg. 138, 138–39 (1957). In enacting these

6. Regulation No. 28 read as follows:

A. No alcoholic beverage shall be sold by any manufacturer or wholesaler to any retailer, nor shall any retailer purchase any alcoholic beverage, except for cash or on terms requiring payment by the purchaser on or before the 15th day of the month following the month of purchase or delivery, which is hereby determined and declared to constitute a reasonable extension of credit, as provided by Sections 18 and 19 of the Alcoholic Beverage Control Act.

B. Each delivery of any alcoholic beverage to a licensee shall be accompanied by an invoice of sale or delivery slip which shall bear as its date the date of delivery of such alcoholic beverage.

C. No manufacturer or wholesaler shall sell, except for cash, any alcoholic beverage to any retailer with knowledge that such retailer is in arrears for the payment of any alcoholic beverage, nor shall any retailer purchase any alcoholic beverage except for cash while in arrears for the payment of any alcoholic beverage, as provided by this rule.

D. Every manufacturer and wholesaler shall file a statement under oath with the Alcoholic Beverage Control Board on or before the 20th day of each and every month, on a form prescribed by the Board, showing any and all delinquent accounts.

Memorandum from Elwood H. Seal, Corporation Counsel, D.C., to the Commissioners at 3 (Mar. 3, 1938) (Regulation No. 28).

7. The Board takes the position that use of the term "principal purpose" in this memorandum indicates that Regulation No. 28 was intended to serve one or more additional purposes. Even if this is so, we doubt whether those additional purposes include imposing a uniform pricing requirement. Assuming *arguendo* that there was an additional purpose, the context suggests that it was to protect wholesalers and manufacturers from losses due to overextension of credit to their customers.

amendments, the Board and Commissioners were responding to reports that producers and wholesalers of alcoholic beverages were avoiding the limits on credit periods by allowing retailers to maintain large delinquent balances. *See* Memorandum from the Alcoholic Beverage Control Board to the Board of Commissioners at 2–3 (April 23, 1957).

In 1963, the United States Court of Appeals for the District of Columbia Circuit struck down the regulations, holding that the Alcoholic Beverage Control Act did not authorize the Commissioners to outlaw all sales to retailers who were more than thirty days behind in their payments. *Press Liquors, Inc. v. Weakly,* 115 U.S.App.D.C. 71, 72–73, 317 F.2d 135, 136–37 (1963). The following year the Board and Commissioners adopted the current regulations, which closely track Regulation No. 28 as it existed in 1938. The only major difference between the two sets of regulations which is significant here is that a portion of the first part of the older regulation is missing, having apparently been replaced by an entirely new section. The missing portion contained the language designed to keep the regulations within the ambit of the provisos discussed above. The new section restated this language and added that "no enlargement or extension of such terms, whether cash or credit, shall be granted by the wholesaler or accepted by the retailer." 23 DCMR § 500.1 (1986) (recodified 1988).[8]

Nowhere in this history is there any discussion, or even any mention, of the notion that wholesalers should be required to charge their cash-on-delivery customers the same price they charge their lawful credit customers. If the drafters had intended to impose such a requirement, then that purpose would surely have been disclosed somewhere during the course of this extensive history.

## IV

■ The Board argues that traditional judicial deference to the interpretation by agencies of statutes or regulations which they administer requires us to uphold the Board's decision in this case. Although we agree that we should defer to any reasonable construction of a statute or regulation, even if our own interpretation would be different if we were proceeding on a clean slate, *Parreco, supra,* at 48; *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984), we do not think that this is an appropriate occasion for deference.

As we recently stated in *Parreco, supra,* at 48,

the deference which courts owe to the interpretation by agencies of statutes which they administer is at its zenith where the administrative construction has been consistent and of long standing. *Atwater v. District of Columbia Department of Consumer & Regulatory Affairs,* [566] A.2d [462] [468] (D.C.1989) and authorities there cited.

The weight which is to be accorded the administrative construction is particularly great where it is a "contemporaneous [one] by the [persons] charged with the responsibility of setting [the] statutory machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51, 55 (D.C.1988) (quoting from *Norwegian Nitrogen Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (Cardozo, J.)). We accord less weight to an agency's interpretation where the attributes of long standing and consistency are lacking. *Parreco, supra,* at 48. We likewise decline to defer to an administrative construction where it is inconsistent with the statutory language or purpose. *Id.; see also Guerra v. District of Columbia Rental Hous. Comm'n,* 501 A.2d 786, 790 (D.C.1985).

---

**8.** The Board asserts that the addition of this new language, which it argues is unnecessary to respond to the *Press Liquors* holding, indicates that the Board intended to extend the regulations to cover new ground. As noted above at p. 8, the additional language is evidence of a much simpler intent. In any event, the new language must surely be stretched beyond recognition if it is to be construed as imposing a uniform pricing requirement.

In the present case, the construction of the regulations at issue has been neither consistent[9] nor of long standing, and it certainly does not represent an attempt by the Board to make *new* regulatory machinery run smoothly. To the contrary, the Board is pouring very new wine into bottles that have been around for quite some time. Indeed, the Board first interpreted these regulations as requiring uniform pricing several decades after their promulgation. The Board's new interpretation, which may well upset a long practice of cash discounts, suggests the wisdom of the Supreme Court's observation (adapted slightly to this case) in *Securities Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947):

> Since the [Board], unlike the court, [has] the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon *ad hoc* adjudication to formulate new standards of conduct within the framework of the [D.C. Alcoholic Beverage Control] Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future.

*See also* K. DAVIS, 3 ADMINISTRATIVE LAW TREATISE § 14.5, at 28 (2d ed. 1980) (agencies should do what they can to use rule-making as the main procedure for creating new law or new policy). Any such rule-making must, of course, be consistent with the statute pursuant to which the rules are being promulgated.

**9.** On three separate occasions, the first two and the last being 42 years apart, the Corporation Counsel of the District of Columbia has explicitly affirmed the validity of trade discounts under the Alcoholic Beverage Control Act, including discounts for immediate payment. *See* Opinion Letter of Corporation Counsel E. Barrett Prettyman of July 3, 1935, *In Re:* letter from Albert Levin, Esq.; Opinion Letter of Corporation Counsel Prettyman, by E. Vernon West, July 8, 1935, *In Re:* Letter from Mr. Louis E. Spiegler; Opinion of Corporation Counsel Louis P. Robbins of August 11, 1977, *In Re:* Whether the District of Columbia Alcoholic Beverage Control Act prohibits "refunds" or "rebates" on alcoholic beverages purchased on a "futures" or "reserve" basis. In his 1977 opinion, the Corporation

## V

Concluding that the Board's interpretation of the regulations in question is erroneous and inconsistent with a reasonable construction of them, we reverse its decision and remand for further proceedings consistent with this opinion.

*So ordered.*

Counsel referred to the July 5, 1935 opinion, which was approved by the Board of Commissioners of the District of Colmbia, and commented as follows:

> This [1935] Opinion construed the provisions of Section 25–120, which prohibits tie-in relationships between wholesalers and retailers. The Opinion concluded by stating that should it later become obvious that such trade discounts are mere subterfuges to require, for example, the exclusive handling of a given line by the association, then the discounts would constitute illegal gifts under the Act. I note there is no evidence of any devious arrangement or subterfuge here.

There is likewise no suggestion in the present case of a devious arrangement or subterfuge.