Margaret A. ROBERTS, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF MEDICINE, Respondent.

No. 89–19.

District of Columbia Court of Appeals.

Argued April 17, 1990.
Decided July 6, 1990.

Inez Smith Reid, Washington, D.C., for petitioner.

Martin B. White, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Dr. Margaret A. Roberts, a psychiatrist at Saint Elizabeths Hospital in Washington, D.C., petitions for review of an order of the District of Columbia Board of Medicine (the Board) denying her application for a license to practice medicine in the District of Columbia under statutory provisions for endorsement and reciprocity.[1] Dr. Roberts' application, submitted to the Board on November 15, 1987, was based upon her license to practice medicine in the state of Michigan. The Board concluded, however,

---

**1.** Dr. Roberts is currently authorized by statute to practice medicine at Saint Elizabeths but not elsewhere in the District. See note 6, *infra.*

that the requirements for licensure in Michigan at the time Dr. Roberts sat for the state's qualifying examination (December 1970) were not "substantially equivalent" to current standards in the District of Columbia. D.C.Code § 2–3305.7 (1988). Although Michigan gave the same exam as that now required by the District, the Federation Licensing Examination (FLEX),[2] and required a passing score of 75% as does the District, it adjusted upwards the scores of some applicants, like Dr. Roberts, who sat for the exam in 1970.[3] Dr. Roberts' actual score, as certified by the Federation of State Medical Boards (the Federation), was 73.3 but was adjusted to 75 by the Michigan examiners. Since the Board requires that all applicants receive a Federation-certified score of 75, Dr. Roberts' applications for a license by endorsement and reciprocity were denied.

In this court, Dr. Roberts contends first that the Board's reliance only upon her FLEX results and refusal to consider her eighteen years of experience in the practice of psychiatry unconstitutionally denied her the right to continue in her chosen profession. She maintains that, as an experienced practitioner, she was entitled to a more searching inquiry into her qualifications including her post-FLEX experience in psychiatry. She further argues that by requiring out-of-state applicants to have scored at least a Federation-certified 75 on the FLEX (required of District examinees), the Board arbitrarily substituted "strict equivalence" for the statutory requirement of "substantial equivalence" governing licensure by endorsement and reciprocity. Finally, Dr. Roberts contends that, when examined in light of the Board's contemporaneous treatment of at least one other identified applicant for licensure from a state which did not require the FLEX, the rejection of her application was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." D.C. Code § 1–1510(a)(3)(A) (1987). That applicant, Dr. Emma Dacquel, also a psychiatrist at Saint Elizabeths, was granted a license to practice in the District of Columbia on the basis of her license from the state of Florida. As far as we can tell from the record, the Board accepted Dr. Dacquel's license at face value without conducting any inquiry into the comparability of Florida's examination procedure with the District's. Dr. Roberts argues that the Board acted arbitrarily by requiring strict equivalency in the case of FLEX states yet accepting without question the license granted by non-FLEX states such as Florida at the time it admitted Dr. Dacquel.

The Board responds that it was neither constitutionally required nor statutorily permitted to take Dr. Roberts' current qualifications (her accumulated experience) into account when considering her application for a license in the District. It further argues that it could reasonably require all new applicants from jurisdictions administering the FLEX to have scored the same minimum grade of 75 required on the District's exam, and was not bound to accept Michigan's appraisal of Dr. Roberts' qualifications (boosting her FLEX grade on the basis of other considerations) over the objective, uniform indicator of competence provided by FLEX. As to Dr. Dacquel, the Board points out that in non-FLEX jurisdictions this objective measure of competence is lacking, and so it can reasonably treat the fact of licensure by those states differently in considering applications for endorsement and reciprocity.

After setting forth the relevant background, we analyze these contentions in order. We conclude that concerns of basic evenhanded treatment require a remand to the Board for further explanation of how, at the time of Dr. Roberts' application, it treated applications for a license by endorsement, reciprocity or waiver by persons from non-FLEX states.

## I.

Dr. Roberts has been practicing psychiatry since 1971. She received her medical

2. The FLEX is a standard national examination now required of applicants for medical licensure in virtually every jurisdiction in the United States.

3. This was the first year in which Michigan administered FLEX.

education in India and was certified to practice medicine and surgery in that country. In 1965, she came to the United States and, after passing an examination for graduates of foreign medical schools, received an internship at Miriam Hospital in Providence, Rhode Island. In January of 1966 she accepted a residency in psychiatry at the University of Michigan Hospital and, after completing this residency in 1970, sat for exams in Michigan that consisted of a basic science exam [4] and the FLEX. The passing grade for each exam was 75. In 1971 Dr. Roberts was informed by the Michigan State Board of Registration in Medicine that she had received a weighted FLEX average of 75 and was given a license to practice medicine.[5]

Between 1971 and 1983 Dr. Roberts worked in Michigan as a psychiatrist and hospital administrator at Northville State Hospital and Providence Hospital. At Northville she began as a staff psychiatrist and was later promoted to assistant director of psychiatric education and training. In 1976 she accepted a position at Providence Hospital as medical director of the out-patient clinic and day treatment center. In 1973 she took and passed specialty examinations administered by the American Board of Psychiatry and Neurology. She later became a diplomate of that board and served as one of its examiners. In 1977 she sat for the Canadian specialty exam and was certified as a specialist in psychiatry by the Royal College of Physicians and Surgeons of Canada.

From 1984 to the present she has worked full-time at Saint Elizabeths Hospital in Washington, D.C. She began as a psychiatrist in the out-patient department and was later named Acting Medical Director in the Division of Community Living. Until October 1, 1987, the Hospital was run by the federal government, and the doctors working at the facility were exempt from the District's licensure requirements while performing the duties of their employment. *See* D.C.Code § 2–3305.2(2) (1988). On October 1, 1987, jurisdiction over the Hospital was transferred to the District of Columbia Commission on Mental Health Services, and physicians were required to meet all local licensure requirements. *See* Saint Elizabeths Hospital and District of Columbia Mental Health Services Act, Pub.L. 98–621, 98 Stat. 3369 (1984), D.C.Code §§ 32–621 to –628 (1988).[6]

Licensure for health related occupations in the District is governed by the "District of Columbia Health Occupations Revision Act of 1985" (the Act). D.C.Code §§ 2–3301.1 to –3312.1 (1988). To be licensed, an applicant must, among other requirements, pass "an examination administered by the board or recognized by the Mayor." Section 3305.3(a)(4).[7] A Board, however, may

---

4. This was a preliminary exam administered by the Michigan Board of Examiners in the Basic Sciences and required of all applicants for licenses in the healing arts. Dr. Roberts' scores were reported as follows: Anatomy—93; Bacteriology—83; Chemistry—84; Pathology—84; and Physiology—87. Her overall average was an 86.2.

5. Dr. Roberts received a temporary license in 1971 which was made permanent in 1973 when her immigration status was resolved.

6. Under this Act, doctors at Saint Elizabeths were given 18 months—until April 1, 1989—to meet all of the District's licensure requirements. § 32–626(a)(2). This period was extended to 27 months—until January 1, 1990—by the "Commission on Mental Health Services Employees Retention Act," 36 D.C.Reg. 5756 (August 11, 1989). The Retention Act also amends D.C.Code § 2–3301.4 (1988) by adding a new subsection (c), which reads in part:

[I]f the employee does not meet all licensure requirements, the employee shall be issued a limited license subject to the provisions, limitations, conditions or restrictions that shall be determined by the appropriate board or commission. The limited license shall not exceed the term of employment with the Commission on Mental Health Services.

*Id.* This amendment would allow Dr. Roberts to continue working as a physician at Saint Elizabeths but nowhere else in the District.

7. *The other requirements are as follows:* (I) the applicant must "not have been convicted of an offense which bears directly on the fitness of the individual to be licensed," § 2–3305.3(a)(1); (II) the applicant must be at least 18 years old, § 2–3305.3(a)(2); (III) the applicant must be "a graduate of an accredited school of medicine and ha[ve] completed at least one year of residency in a hospital ... licensed by the District or any other state," §§ 2–3305.3(a)(3), –3305.-4(e); and (IV) the applicant must meet "any

waive the examination requirements, in its discretion,

> for any applicant who otherwise qualifies for licensure and who is currently licensed or certified under the laws of a state or territory of the United States with standards which, in the opinion of the board, were substantially equivalent at the date of the licensure or certification to the requirements of this chapter....

Section 2–3305.6(e)(1). Similarly, a Board, in its discretion, may issue a license by "reciprocity" or "endorsement" to an applicant "[w]ho is licensed or certified and in good standing under the laws of another state with requirements which, in the opinion of the board, were substantially equivalent at the time of licensure to the require-

ments of this chapter...." Section 2–3305.7(1).[8]

On November 15, 1987, Dr. Roberts submitted her application for license by endorsement on the basis of her Michigan license. On March 15, 1988, the Board issued a notice of intent to deny her application on the ground that she had "failed to establish [that she was] professionally qualified to be issued a license by endorsement pursuant to D.C.Code § 2–3305.7(1)." The Board concluded that since Dr. Roberts had been licensed in Michigan on the basis of a 73.30 FLEX score as reported by the Federation,[9] and since the District of Columbia requires a passing score of 75, the "State of Michigan's licensure requirements were not, at the time of [Dr. Roberts'] licensure, substantially equivalent to those now in effect in the District...." [10]

---

other requirements established by the Mayor by rule to assure that the applicant has had the proper training, experience, and qualifications to practice the health occupation." Section 2–3305.3(a)(5).

**8.** The difference in meaning between "reciprocity" and "endorsement" is not clear. The Act does not define the terms and the Board concedes in its brief that "the terms apparently do not have precise legal meanings, at least under District law." As noted *infra*, note 11, the Board returned a separate application by Dr. Roberts for a license by reciprocity in part on the ground that it raised the same "issues, both legal

and factual," presented by her pending application for endorsement. For purposes of this opinion, the concepts are interchangeable.

**9.** Apparently, these scores are not sent directly to the applicant, but instead go first to the state licensing authority which then forwards them to the applicant. In this case, Dr. Roberts was told by the Michigan Board in 1971 that she had received a weighted FLEX average of 75.

Dr. Roberts' FLEX scores as reported by the Federation of State Medical Boards (FSMB) and as adjusted by the Michigan Board of Medical Examiners (MBME) were as follows:

| | Scores reported by the FSMB | Scores reported by the MBME |
|---|---|---|
| BASIC SCIENCE | | |
| Anatomy | 71 | 75 |
| Physiology | 60 | 68 |
| Biochemistry | 70 | 74 |
| Pathology | 79 | 83 |
| Microbiology | 71 | 75 |
| Pharmacology | 71 | 75 |
| BASIC SCIENCE AVERAGE | 70.3 | 75 |
| CLINICAL SCIENCE | | |
| Medicine | 82 | 82 |
| Surgery | 73 | 73 |
| Obstetrics | 76 | 76 |
| Public Health | 68 | 68 |
| Pediatrics | 69 | 69 |
| Psychiatry | 88 | 88 |
| CLINICAL SCIENCE AVERAGE | 76 | 76 |
| CLINICAL COMPETENCE AVERAGE | 72.5 | 75 |
| FLEX WEIGHTED AVERAGE | 73.3 | 75 |

**10.** Dr. Roberts apparently had no knowledge that she had received less than a 75 until 1983. In that year she applied for a license in North Carolina based upon her Michigan license. Her application was returned on the ground that her FLEX score was too low, and she was told that

she would have to take the FLEX again in order to be considered. She did not pursue admission in North Carolina further.

Dr. Roberts then requested a hearing and, on May 23, submitted an application for a license by reciprocity.[11] At the hearing, held on June 1, 1988, she presented evidence of both her education and experience in the practice of psychiatry. The Board made clear, however, that in ruling on her application for licensure by endorsement, it could not consider her present qualifications but only the conditions under which she was originally licensed in Michigan and whether the conditions were substantially equivalent to those imposed by the District. As part of the government's case, the Corporation Counsel introduced the instructions accompanying each application for licensure. The instructions state that in addition to meeting all general requirements, applicants for licensure by endorsement of their FLEX scores "must have received a certified score of at least 75 on the FLEX at a single sitting." The Corporation Counsel introduced a letter dated May 26, 1988, from Marcia Malouin of the Michigan Department of Licensing and Regulation confirming that Dr. Roberts' score had been 75 only after adjustment. Ms. Malouin stated:

> [T]he Michigan Board of Medical Examiners, the predecessor board to the Michigan Board of Medicine, adjusted the scores of the candidates who sat for the first and second administrations of the FLEX examinations given in Michigan in June and December of 1970.
>
> Although the records of the board do not indicate the specific reason for their action, it appears that the adjustment was made for either or both of the following; the first two FLEX administrations produced a significantly larger number of failures than had been the experience on previous administrations of the Board's own examination; the board adjusted only the basic science

scores of candidates who had previously been certified by the Michigan Basic Science Board.

In its December 14, 1988 Findings of Fact, Conclusions of Law and Order, the Board denied Dr. Roberts' application for a license by endorsement. While noting her education, experience, and qualifications, the Board concluded that since she had been licensed by Michigan after receiving a FLEX score of 73.3, the Michigan requirements were not strictly equivalent to those in the District. The Board explained that its policy was to "require[ ] strict equivalency where the FLEX examination is used as part of a qualifying process for licensure by endorsement from another jurisdiction...." And, while recognizing "that it has the discretionary authority to depart from any equivalency standard in endorsing licenses from other jurisdictions," the Board concluded that this authority "is best reserved for instances where equivalency is not readily measurable. For example, the Board reviews state-constructed examinations [*i.e.*, exams used in non-FLEX states] on the basis of substantial equivalency since they are not accredited." The Board rejected petitioner's argument that the 1970 Michigan exam should be treated as a "state-constructed" exam combining elements of the state's Basic Science exam with the newly introduced FLEX. The Board therefore declined to consider Dr. Roberts' application for licensure by endorsement.[12]

## II.

### A.

■ We first address Dr. Roberts' argument that the Board's reliance solely upon her Federation-certified FLEX score and

---

11. That application was returned to her without explanation on June 2, 1988. The Board later gave a reason for this decision in a footnote to its December 14, 1988 Findings of Fact, Conclusions of Law and Order. It stated that: (1) Dr. Roberts' existing application had already "raised all relevant issues, both legal and factual, about her qualifications"; (2) D.C.Code § 2–3305.7 (1988) treats licensure by endorsement and reciprocity identically; and (3) the Board has no

reciprocal agreements with Michigan or any other jurisdiction.

12. The Board also found that Dr. Roberts had not been forthright in her statements to the Board about her actual FLEX score. Since this finding, however, does not appear to have played any role in the Board's ultimate decision, we do not address Dr. Roberts' argument that it was unsupported by substantial evidence in the record. D.C.Code § 1–1510(a)(3)(E).

refusal to consider her current qualifications, including four years of practice at Saint Elizabeths, violated her due process rights by creating an irrebuttable presumption of incompetence. Although D.C.Code § 2–3305.7 expressly permits the Board to grant a license by reciprocity or endorsement only if, in its opinion, the original license was granted under requirements that were substantially equivalent *"at the time of licensure"* (emphasis added) to the District's requirements,[13] Dr. Roberts contends that under what she terms "the principle of the experienced practitioner" recognized in *Donahue v. District of Columbia Board of Psychology*, 562 A.2d 116 (D.C.1989), and *Berger v. Board of Psychologist Examiners*, 172 U.S.App.D.C. 396, 521 F.2d 1056 (1975), she had a constitutionally protected interest in licensure in the District which entitled her to a more searching review of her qualifications. We conclude that these cases do not support Dr. Roberts' claim and that she has suffered no constitutional injury.

In *Berger*, a psychologist who had been practicing for fourteen years without restriction in the District of Columbia, challenged the constitutionality of a new law requiring a license for all psychologists and providing that licenses would be granted only to those with a doctoral degree in psychology or a related profession. Since Berger did not have such a degree and the statute provided no other way in which he could demonstrate his competence, he was denied a license. Reversing, the court of appeals held that the new law created an irrebuttable presumption that "unreasonably deprive[d] Berger of his constitutionally recognized interest in the practice of psychology in violation of the Due Process Clause of the Fifth Amendment." *Id.* at 403, 521 F.2d at 1063. The court explained,

however, that this holding was confined to those psychologists already practicing in the District of Columbia and that an irrebuttable presumption would "not [be] invalid with respect to future psychologists, but only with respect to current practitioners who have no meaningful grandfather rights." *Id.*[14] In *Donahue*, this court likewise concluded that prospective applicants have no constitutionally protected interest in licensure by the District of Columbia, but that this interest attaches only to those previously practicing in the District. 562 A.2d at 122.

Unlike the psychologist in *Berger*, Dr. Roberts has never practiced without restriction in the District of Columbia. Although she has spent four years as a psychiatrist at Saint Elizabeths, she did so under a special statutory dispensation exempting doctors working there from local licensing requirements. See note 6, *supra*, and accompanying text. Upon transfer of Saint Elizabeths to operation by the District of Columbia, Dr. Roberts—if she desired to practice generally in the District— was required to apply for a license in the same manner as one seeking a license to practice in the District for the first time. Unlike Berger, therefore, she had no vested interest in a local practice. As applied to her, the Board's presumption that those who have scored less than 75 on the FLEX are not qualified to practice in the District of Columbia is not unconstitutional.[15] *See Donahue*, 562 A.2d at 122; *Berger*, 172 U.S.App.D.C. at 403, 521 F.2d at 1063. *See also Valdes v. New Jersey State Bd. of Medical Examiners*, 205 N.J.Super. 398, 405, 501 A.2d 166, 170 (1985) ("Before a medical license is issued there is no property right which must be safeguarded by due process").

---

**13.** *See also* D.C.Code § 2–3305.6(e)(1), permitting waiver of the examination requirement for a person currently licensed by a state under standards "substantially equivalent at the date of the licensure or certification to the [District's] requirements...."

**14.** Even then, the court declined to compel the licensing board to grant Berger a license but ordered the case remanded with instructions for

the Board to administer an examination so as to afford Berger a chance to prove his qualifications. *Id.* at 404, 521 F.2d at 1064.

**15.** Even if Dr. Roberts were in the same position as the psychologist in *Berger*, under that decision she arguably was entitled only to the opportunity to demonstrate her qualifications by taking the FLEX exam—an option still open to her. See note 14, *supra*.

■ We do not gainsay Dr. Roberts' impressive achievements since her licensing by Michigan in 1970. Section 2–3305.7, however, reflects a legislative judgment that, apart from current licensure and good standing in another state, the relevant considerations for a license by endorsement and reciprocity are circumstances at the time of original licensure and not intervening experience or accomplishment—perhaps because the latter, as an objective measurement of qualification, are too difficult to assess. We cannot say, as Dr. Roberts would, that that judgment is irrational merely because her experience is long and her achievements many.

## B.

■ Dr. Roberts also contends that the Board violated the statutory standard for reciprocity and endorsement by substituting a measure of "strict equivalency" as to the examination requirement for the statutory "substantial equivalency" when judging applicants from states employing FLEX. While the Board does insist upon strict equivalency in these circumstances, we conclude that, given the broad discretion granted the Board in administering the waiver and endorsement provisions, §§ 2–3305.6(e), 2–3305.7, that policy does not exceed its statutory authority.

■ An agency's interpretation of a statute it is charged with administering "is binding on the court unless it conflicts with the plain meaning of the statute or its legislative history." *Donahue, supra,* 562 A.2d at 119; *see Superior Beverages v. District of Columbia Alcoholic Beverage Control Bd.,* 567 A.2d 1319, 1325 (D.C. 1989) (reviewing court should defer to any reasonable construction of statute by agency). The statutory measure of substantial equivalency governing applications for a license by reciprocity or endorsement relates to each of the District's conditions for licensure. See n. 7 & accompanying text, *supra.* However, as to the one condition—successful completion of FLEX—which the Board deems the strongest indicator of competence to practice medicine in the District, the Board has chosen to require strict

conformity with the District's minimum passing grade of 75. That interpretation of substantial equivalency is not unreasonable. *See Sutto v. Board of Medical Registration & Examination,* 242 Ind. 556, 180 N.E.2d 533, 538 (1962) ("substantially equivalent" means "that which is equal in value in essential and material requirements"); *cf. Harper v. District of Columbia Committee on Admissions,* 375 A.2d 25, 28 n. 4 (D.C.1977) (requirement of passing score of 70 on Bar exam reasonable).

D.C.Code § 2–3305.7(1) expressly commits the determination of substantial equivalency to "the opinion of the board...." As the Board explained in denying Dr. Roberts' application:

> The purpose of the FLEX Program is to provide a high-quality, objective and standardized examination for use by physician licensing boards as their own qualifying assessment for licensure. Such an examination provides a uniform and equitable assessment in terms of content, levels of difficulty, and scoring practices, creating a rational basis for interstate endorsements/reciprocity.

*See also Department of Professional Regulation, Bd. of Medical Examiners v. Durrani,* 455 So.2d 515, 518 (Fla.App.1984) ("[e]stablishment of examination criteria for endorsement candidates identical to that imposed on examination candidates implements" goal of national uniformity). And, in the Board's view, insisting on strict conformity to the District's passing grade in endorsement or reciprocity cases prevents manipulation of differences among states:

> It is foreseeable that were the Board to approve a lower passing score for out-of-state applicants, the Board's passing score might be circumvented. Thus, an applicant failing to obtain a FLEX 75 on the examination in the District could gain licensure in another state where a lower score is acceptable and then seek licensure on the basis of endorsement in the District of Columbia.

In addition, since FLEX was given in the majority of jurisdictions even at the time Dr. Roberts sat for the exam, strict equiva-

lency enables the Board to avoid the administrative problem of having to make individualized competency evaluations whenever an applicant receives less than 75 on the out-of-state FLEX exam.

In sum, although the Board's requirement of a 75 passing grade may seem harsh when the applicant came close to that and was certified by another state, it is the Board's duty to protect the general public from unqualified physicians, and the requirement rationally serves that purpose. *Donahue, supra,* 562 A.2d at 123.[16] We will not substitute our judgment for the Board's opinion that a uniform score—recommended by the Federation—guarantees equal treatment to District examinees and provides the safest measure of competence to practice in the District.[17]

### C.

We turn, therefore, to what we consider the troublesome question presented by this case, of how the Board treats applicants for a license by endorsement from states that do not—or did not at the relevant time—administer FLEX as part of their licensing process. As explained earlier, the Board's policy is that while it has discretion to depart from its requirement of strict equivalency, in regard to exam results, that discretion "is best reserved for instances where equivalency is not readily measurable. For example, the Board reviews state-constructed [non-FLEX] examinations on the basis of substantial equivalency since they are not accredited." In other words, because "it is impossible to measure exact equivalency between state-constructed examinations since they are not standardized," the Board apparently performs a functional analysis of the requirements of non-FLEX states, including the exam administered, to determine comparability with FLEX and the District's requirements.

There is nothing problematic about this approach. Where a state does not give the standardized FLEX exam, the Board pur-

**16.** In asserting that "nothing in our statute ... requires an applicant to score 75 on the FLEX test," our dissenting colleague points out that "[t]he required substantial equivalency must be with the statute [specifically, "the requirements of this chapter"], not with standards promulgated by the Board." *Post,* at 330. However, one "requirement of this chapter" is a qualifying examination whose "subjects, scope, form, and passing score" the *"board* shall determine ..." (emphasis added). The statute thus invests the Board with responsibility to establish an examination and a passing score. It is not enough simply to dislike the passing score the Board has chosen when applied to a person who has amassed substantial qualifications since *failing* the exam. While our sympathies may tell us not to "fret unduly" over what occurred in 1970, *post,* at 329, the statute we apply mandates that the substantial equivalency determination be made as of "the time of licensure" by the other state.

**17.** We reject Dr. Roberts' reliance on *United States ex rel. Thomson v. Custis,* 35 App.D.C. 247 (1910), which involved interpretation of a medical licensure statute granting far less discretion to the licensing board than does the current Health Occupations Revision Act. The statute in *Custis* "authorized and *directed"* (emphasis added) the board of medical supervisors to license applicants who met the specified requirements. Moreover, *Custis* antedated by years the adoption of uniform professional licensing standards reflected in the nationwide FLEX exam,

and only that fact enabled the court to declare: "About the most inequitable test of ability that can be applied is the comparison of examination grades derived from either the same or different sources." *Id.* at 252. The *Custis* court's thinly veiled contempt for the assertion of authority by "a mere medical board," *id.* —besides exhibiting a then-current hostility toward administratively established standards, *see* K. Davis, Handbook on Administrative Law, 41–44, 59–64 (1951)—has no relevance to the present statute, which empowers the Board of Medicine to establish the form, subjects and passing score for a qualifying exam and commits the determination of substantial equivalency with the District's requirements to the Board's discretion.

We further reject Dr. Roberts' argument that since there was no statutory requirement or regulation at the time she applied for a license requiring an applicant to receive a 75 on the FLEX, the Board was without authority to impose such a requirement. D.C.Code § 2–3305.6(d) provides:

[E]ach board shall determine the subjects, scope, form, *and passing score* for examinations to assess the ability of the applicant to practice effectively the health occupation regulated by the board. [Emphasis added.]

The Code does not prevent the Board from determining, as a matter of policy and without formal rulemaking, the minimum passing score required for licensure in the District. *See Hicks v. Physical Therapists Examining Bd.,* 221 A.2d 712, 715 (D.C.1966).

sues the next best way of measuring substantial equivalency, evaluating the state-constructed exam for comparability. *See District of Columbia v. Douglass,* 452 A.2d 329, 331 (D.C.1982) (Board denied license by endorsement on ground, *inter alia,* that Oregon naturopathic examination not comparable to FLEX); *Indiana Bd. of Chiropractic Examiners v. Chamberlain,* 495 N.E.2d 794, 796 (Ind.App.1986) (in determining substantial equivalency, licensing board may compare substance and form of another jurisdiction's exam with its own). The difficulty in this case is that there is evidence in the record before us indicating that, while the Board required strict equivalency in the case of Dr. Roberts, at the time of her application it may not have required even substantial equivalency in the case of applicants licensed by non-FLEX states. If that is so, then we are concerned that not only may the Board have departed from its basic duty to treat like cases alike, but its justification for the policy of endorsing FLEX-qualified applicants only if they scored a Federation-certified 75 is substantially undercut.

The record reflects that when another psychiatrist at Saint Elizabeths, Dr. Dacquel, applied for a license in the District at about the same time as Dr. Roberts on the basis of her license from the state of Florida (apparently a non-FLEX state at the time Dr. Dacquel was admitted), the Board apparently accepted that license at face value without any inquiry into the comparability of the Florida exam.[18] Nor is there evidence that the Board had ever compared the exam then administered by Florida with FLEX. Thus the Board, in regard to a measure of qualification it deems critical, appeared willing to let the state of Florida determine the competence of Dr. Dacquel to practice medicine in the District of Columbia. We cannot tell from the record whether Dr. Dacquel's treatment was an isolated instance or instead reflects a broader disparity between the Board's professed policy of "review[ing] state constructed examinations on the basis of substantial equivalency" and its actual practice. If the latter, however, then the Board's practice regarding non-FLEX states would contradict its concern for an objective, uniform measure of competence that underlies the strict equivalency rule applied to Dr. Roberts. The Board would be uncritically accepting licensure by non-FLEX states while requiring strict conformity to the District's grade requirement in the case of FLEX states, even ones like Michigan in 1970 which combined FLEX with another exam to produce a hybrid, "state-constructed" examination. In that event, we would have deep misgivings about the fairness—the evenhandedness—of the Board's rejection of Dr. Roberts' request that it consider the "complete examination" administered to her by Michigan, including FLEX and the basic science exam,[19] while accepting *carte blanche* the licenses of states using exams that in theory may have none of the rigor of FLEX.

We are of the view, therefore, that the Board must explain more fully than it has so far the inconsistency suggested by its differing treatment of Dr. Dacquel and Dr. Roberts. It needs to tell us first whether Dr. Dacquel was excused from taking the District's exam on the basis solely of her Florida license, without any comparability analysis of the respective exams. Second, assuming this is so, it may be that Dr. Dacquel's case is an isolated, utterly untypical one. As implied above, we would not

---

**18.** In response to an inquiry from Dr. Roberts' attorney, Lewis H. Wright II, the Freedom of Information Liaison for the District of Columbia Occupational and Professional Licensing Administration, wrote in part:

> You wanted to know if the Board of Medicine ever issued any explanatory decision to accompany its *July 21, 1988* order voiding written examinations for Dr. Dacquel? No, the Board did not issue any explanatory decision. You also asked did the Board review the scores achieved by Dr. Dacquel on her Florida

medical examination? According to the records, the Board did not use the scores achieved by Dr. Dacquel, merely the Florida license.

**19.** Ironically, the instructions issued to applicants seeking a license by reciprocity in the District of Columbia state that "[a]pplicants must have attained a certified score of at least 75% on the jurisdiction's *complete* examination" (emphasis added).

be disposed to question the Board's insistence on strict equivalency in the case of FLEX states—and of Dr. Roberts' application in particular—if the apparent uncritical acceptance of Dr. Dacquel's license were an aberration from a general practice of reviewing state-constructed exams for substantial equivalency to FLEX. A general policy of using FLEX or FLEX-comparability as an essential measure of competence would not be invalidated by an isolated failure in applying it. On the other hand, a general practice of treating non-FLEX and FLEX exams in the radically disparate manner shown by the apparent treatment of Dr. Dacquel and Dr. Roberts would import into the Board's administration of the endorsement/reciprocity provisions an unacceptable degree of arbitrariness.

For this reason, the record must be remanded for a further explanation of the Board's practice in reviewing state-constructed examinations for equivalency at the time of Dr. Roberts' application.

The matter is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

I agree with the majority that the refusal to license Dr. Roberts is suspect in the light of the Board's far more favorable treatment of Dr. Dacquel, who was apparently admitted to practice in the District on the basis of her license from the State of Florida without any inquiry into the comparability of that state's exam. In my opinion, however, the Board's action vis-a-vis Dr. Roberts was lacking in rationality on this record even aside from the contrasting treatment of Dr. Dacquel. Moreover, in light of what we already know of Dr. Dacquel's case, I think a remand is unnecessary and will only prolong a palpable injustice.

As my colleagues point out, maj. op. at 327, it is the Board's duty to protect the general public from unqualified physicians. It is evident from this record, however—indeed, it is undisputed—that this lofty legislative purpose is not served by, and has nothing whatever to do with, the denial of a license to Dr. Roberts. In the words of the Chairman of the Hearing Panel,

I reiterate that we're talking about the FLEX and that's what we're talking about in terms of professionally qualified—*not her current qualifications.*

(Emphasis added).

Dr. Roberts took the FLEX examination in Michigan in 1970. She did well enough in that exam (and far better in a companion one, see maj. op. at 322 n. 4), to satisfy the Michigan authorities that she was qualified to practice psychiatry, although she was then without practical experience as a psychiatrist and the test scores were all she had. It seems to me implausible to suggest twenty years later that these scores, plus a wealth of experience and proven excellence, are insufficient to qualify Dr. Roberts to practice today in the District.

Much has occurred in Dr. Roberts' professional life since 1970. She has had a distinguished career in psychiatry. She has taken and passed specialty examinations given by the American Board of Psychiatry and Neurology and by the Royal College of Physicians and Surgeons of Canada.[1] She proffers that at Saint Elizabeths Hospital, where she has served as a medical officer in psychiatry since 1984, she has received only "Outstanding" and "Excellent" ratings. Dr. Chester Pierce, a Professor of Psychiatry at Harvard University, stated in an affidavit, among other encomia, that "Dr. Roberts enjoys a national reputation and is highly regarded in the field of psychiatry." According to Dr. Roger Peele, Chairman of the Department of Psychiatry at Saint Elizabeths, "Dr. Roberts is an outstanding psychiatrist in my point of view.... She's probably the best example of someone who is capable of holding patients in the community who are mentally disabled." Indeed, Dr. Roberts now administers the FLEX test and, ac-

---

**1.** Dr. Roberts is apparently one of the few non-Canadians licensed by the Royal College.

cording to Dr. Peele, she is very skilled with it.

If a visitor from Mars, uncluttered by legal doctrine, were asked to opine on the data available to the Board with respect to Dr. Roberts' qualifications to practice psychiatry in the District of Columbia in 1990, I do not think he or she would fret unduly, as the Board did, over the 1970 FLEX score. Unless common sense is anathema to our legislative, administrative and judicial processes, Dr. Roberts should be granted a license.

Contrary to the government's argument, our statute does not require us to reach a result which, at least in my view, cannot be squared with common sense. Section 2-3305.7(1) provides that the Board may issue a license by reciprocity or endorsement to an applicant "who is licensed ... and in good standing under the laws of another state with requirements which, in the opinion of the board, were substantially equivalent at the time of licensure to *the requirements of this chapter.*" (Emphasis added.) The required substantial equivalency must be with the statute, not with standards promulgated by the Board. There is nothing in our statute which requires an applicant to score 75 on the FLEX test; indeed, no regulation requiring such a score had been promulgated at the time Dr. Roberts applied.[2]

In *United States ex rel. Thomson v. Custis*, 35 App.D.C. 247 (1910), the District of Columbia Board of Medical Supervisors had denied a medical license to a physician who had been admitted to practice in Maryland. The Board concluded that "the conditions under which [the applicant] passed his examination for license to practice were [not] equivalent to conditions existing in the District of Columbia." *Id.* at 248–49.

**2.** The Board apparently did require such a score as a matter of informal policy. A regulation reaffirming this policy has been promulgated since Dr. Roberts filed her application.

**3.** My colleagues indicate, maj. op. at 327 n. 16, that the present statute vests greater discretion in the licensing board than did the provision under consideration in *Custis*. In my opinion, however, the majority attaches an exaggerated

The court, however, ruled in the applicant's favor:

> We think equivalent conditions exist under this statute by virtue of the provisions of law, and not under the rules of the Board.... The Maryland board may have an entirely different set of rules for carrying into effect substantially the same statute as ours; but that is a mere matter of local procedure, which cannot affect the reciprocal rights of practitioners in one jurisdiction to practise in another, provided they meet the requirements of the board in the state where originally admitted *and the provisions of the statute in the jurisdiction where they desire to practise.*

(Emphasis added).

It is noteworthy that at the time *Custis* was decided, the applicable statute authorized the Board to license only those persons who had acquired the right to practice medicine in a jurisdiction "under conditions *equivalent* to those with which he would have had to comply in the District." *See* Act of January 19, 1905, ch. 49, 33 Stat. 609, quoted in *Custis*, 35 App.D.C. at 250. The present statute is less exacting, in that it requires only *substantial equivalency.* If the equivalency requirement of the earlier statute did not embrace the examination scores then required by the Board, then the same must logically be true, *a fortiori*, of the current statute. If the legislature had intended to overturn the result in *Custis*, it could readily have accomplished this purpose by requiring substantial equivalency with standards established by administrative action as well as with those imposed by the governing statute. The Council did not do so, however, and we ought not to consign the venerable *Custis* decision to a premature burial particularly where, as here, the result would be so unreasonable and unjust.[3]

degree of importance to these alleged differences.

Section 2–3305.6(d) of the present statute authorizes the Board to prescribe the subjects, scope, form and passing score for examinations to assess the applicant's ability to practice. In the statute at issue in *Custis*, too, the legislature had left to the Board the responsibility of preparing and grading the necessary examination;

I agree that our standard of review of the Board's action must be deferential, although less deference is due where the requirement in question—here a score of 75 in the FLEX—is of recent origin and has not been uniformly applied. *See, e.g., Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 567 A.2d 1319, 1325 (D.C.1989). I also recognize that there is a rational basis for requiring all applicants to obtain a specified passing score on a uniformly applied test rather than relying on performance appraisals and testimonials, for the latter are necessarily subjective and difficult to assess.[4] But for applicants admitted in other jurisdictions, our statute does not require strict equivalency with Board-imposed standards but substantial equivalency with statutory ones. Moreover, the Board is also selective in the rigor with which it applies the doctrine of "FLEX score, FLEX score, *über alles*"; this selec-

tivity is reflected by its approach in non-FLEX states and in its handling of Dr. Dacquel's application. Although I acknowledge that a remand can dot some i's and cross some t's, I think we already know enough from the present record, and in particular from the government's explanation of the reasons for the admission of Dr. Dacquel without any inquiry into test scores,[5] to warrant our ordering Dr. Roberts' admission to practice *now*. I would forego further potentially protracted and expensive Board proceedings during which an obviously qualified practitioner would presumably continue to be excluded from practice in the District.

indeed, the Board was to determine "all relevant matters of fact." The similarity of the two statutes in the essential respect that, in each, equivalency or substantial equivalency had to be established with *statutory* requirements, not with administrative ones, is of far greater consequence than the existence of any additional agency discretion in other respects under the present statutory scheme.

My colleagues also point out that § 2–3305.7(a) requires substantial equivalency "in the opinion of the Board." The Board has not suggested, however, that the *statutory* requirements of licensure in Michigan in 1970 lack substantial equivalency to the *statutory* standards of licensure in the District in 1990. The phrase "in the opinion of the Board" thus comes into play only if we deem the substantial equivalency requirement to apply to administrative standards. For the reasons stated in the text, I am satisfied that we ought not to do so.

4. In *Harper v. District of Columbia Committee on Admissions,* 375 A.2d 25, 28 n. 4 (D.C.1977), we found the requirement of a passing score of 70 on the Bar examination to be a reasonable one. I have no quarrel with that result, but the applicant in *Harper* was seeking admission on the basis of the exam and not under a "substantial equivalency" provision designed to provide a means of qualifying without taking the exam.

5. Neither the Board in its findings nor the government in its brief or oral submission has suggested that the handling of Dr. Dacquel's case represents an aberration from the norm for processing applications from non-FLEX jurisdictions. I am not sure I understand why the government should now be accorded a second opportunity to demonstrate something it has never contended, especially since Dr. Roberts will remain unlicensed in the meantime.